LUSCOMBE v. PETERSON.

DEEDS—DELIVERY—ESCROW.

 Complainant entered into possession of his brother's farm, as claimed by him, under an agreement to work the land during the brother's lifetime and to have the proceeds thereof, paying the taxes and keeping up the place: complainant also averred that his brother some years later stated that he had fixed the title so that it would pass at his death to complainant. The brother denied any agreement to convey title. In

reliance on such arrangement, complainant claimed to have built a house on the premises. In fact the brother had prepared a deed, which he left in escrow with a justice of the peace whereby complainant and his wife were to have a life estate after the grantor's death, their son to have a life estate and the remainder to their grandson. Said grantor afterwards being advised that the deed was invalid, prepared a new instrument which he intended to take effect after his death, but delivered to complainant who handed it to the scrivener. It was not recorded. *Held,* that the transaction operated as a delivery to complainant, that title passed and the grantor could not later recall the deed and execute a conveyance to third persons.[1] OSTRANDER, STONE, and BIRD, JJ., dissenting.

Appeal from Montcalm; Davis, J. Submitted June 7, 1912. (Docket No. 47.) Decided December 17, 1912. Rehearing denied February 18, 1913.

Bill by John B. Luscombe and others against Peter Peterson and another for the cancellation of a deed, and other relief. From a decree for complainants, defendants appeal. Affirmed.

*R. A. Hawley,* for complainants.

*I. L. Hubbell* and *F. C. Miller,* for defendants.

BROOKE, J. I am of the opinion that the learned circuit judge reached a proper conclusion in this cause. After Lyman W. Luscombe learned from Wilson, who drew the original papers, that they were no good, he went back to Wilson with the complainant, John B. Luscombe, for the purpose of correcting the error he had been told was made.

He testified:

"*Q.* Before you made the change you told your brother John, and you and John went to Wilson together, didn't you?

[1] As to effect of delivery of deed to grantee, subject to a future extrinsic condition, see note in 16 L. R. A. (N. S.) 941.

Delivery of deed to third person to be delivered to grantee after grantor's death upon performance of conditions by grantee, see note in 9 L. R. A. (N. S.) 317.

"*A.* Yes; he said it was no good.

"*Q.* You fixed it up so it was good?

"*A.* I supposed so.

"*Q.* So your brother would have it after you passed away while he and his wife lived and then Robert should have it?

"*A.* Yes, sir.

"*Q.* You fixed it up that way?

"*A.* Yes, sir."

Wilson, the scrivener, testified in part as follows:

"*A.* He wanted to deed it to his brother, John, and at his death and his wife's death he wanted his son, Robert, John's son Robert, to have it as long as he lived. Then he wanted Robert's oldest son to have it. I can't say as I remember any further conversation before drawing up the papers. Might by jogging my memory; a good many years ago. I believe he stated John lived on the place at that time. If he told me how long John had lived there, I don't remember. I made out a deed at that time.

"*Q.* I wish you would describe what was in the instrument, as near as you can remember.

"*A.* The deed was filled out as Lyman Luscombe as party of the first part to John B. Luscombe as party of the second. The consideration, if I remember right, was $1. Then the description of the land was given, and then, after the description was given, it further stated that at the time of John's death and his wife's he wanted Robert Luscombe to have it, his son, John's son; and at the time of his death, Robert's death, he wanted Robert's oldest son to have it. After I drew the document, I read it to him. It was drawn on a warranty deed headed 'Long Form,' containing the usual covenants.

"*Q.* After the deed was drawn and read to him what was done?

"*A.* He told me he wanted to leave it with me.

"*Q.* Did he sign it?

"*A.* Yes, sir; he signed the deed.

"*Q.* Will you state as to whether it was witnessed or not?

"*A.* Yes; signed, witnessed, and acknowledged. I don't remember who the witnesses were. There were two of them. I was a notary, and took the acknowledgment. Nothing further said or done about it any further than he

told me to keep it.   He wanted to leave the papers with me.   *   *   *

"*Q.* When he came to your office in 1904, as you remember it, in relation to this property, do you know how he happened to come there at that time ?

"*A.* My attention was called on the street or in the People's Savings Bank over here by Mr. Lambertson to an article in the Northwestern Review, stating that a deed made in that kind of manner there had to be a transfer made.

"*Q.* Delivery you mean ?

"*A.* Yes, sir; delivery of the deed.   I had left my papers there at the bank, and Mr. Lambertson knew they were there, and I brought up that matter about him. I said there was no delivery made there.   We talked the matter over.   So I called Lyman's attention to it.

"*Q.* In what way ?

"*A.* I have forgot whether—I think I spoke to him. I told him I was informed there had to be a delivery made of the deed, and I think I wrote to John, his brother.   I think I wrote to him, and says I, ' If that is the case, we had better fix these matters up.'   So he and John came into the store together, to the best of my remembrance, and I told him that this deed that he drew up formerly looked to me as though it was entailing the property.   I told him, if I was in his place, I would change it, and have only one name mentioned in it besides John's.   He told me I might draw up another one.   So I drew up another deed of the same property, and with just Robert's name mentioned besides John's.

"*Q.* How was that deed worded, as near as you can remember it ?

"*A.* It was worded like the first one, copied from the first one, with the exception of Robert's oldest son.

"*Q.* That was left out ?

"*A.* Yes, sir.

"*Q.* Now was that deed read over to Lyman Luscombe ?

"*A.* To the best of my remembrance it was.

"*Q.* When he came there on each occasion, as I understand you, or on the first occasion when he came there, he told you he wanted a deed made of his property ?

"*A.* Yes, sir.

"*Q.* To John?   And he stated he wanted it fixed so it would not have to be probated ?

"*A.* Yes, sir.

"*Q.* Did he say anything about being opposed to the probating of estates?

"*A.* Well, he grumbled about the expense that was attached to it, and he said as a rule the lawyers got a good share of it. He wanted his fixed so there wouldn't be any expense.

"*Q.* When he came there the second time, and this last deed was made, the deed you have just referred to was made, did he say anything at that time about fixing it so it wouldn't have to be probated?

"*A.* I don't remember of it now. It was read over to him, signed, witnessed, and acknowledged. I think Alvin Lloyd and Henry Friedley witnessed it. I took the acknowledgment as a notary public at that time. That acknowledgment was certified on the instrument itself in the usual form in vogue in this State. It was a long form warranty deed.

"*Q.* Was John Luscombe present on that occasion, the second time?

"*A.* To the best of my remembrance he was sitting down by the stove. I couldn't say positive. I think he was. The first time he wasn't there.

"*Q.* The second time he was?

"*A.* Yes, sir; as I remember it.

"*Q.* After the deed was drawn and fully executed except delivery, what was done with it?

"*A.* The three of us went over to the People's Savings Bank and I gave Lyman the deed. He passed it to John, and John handed it to me and I took care of it.

"*Q.* Lyman Luscombe delivered it to John Luscombe?

"*A.* Yes, sir.

"*Q.* And John handed it to you?

"*A.* Yes, sir.

"*Q.* What were your instructions in relation to what was finally to be done with that deed?

"*A.* The instructions were the same as the other, that I was to keep the deed and in case of his death I was to pass it to John.

"*Q.* That is, hand it to John?

"*A.* Yes, sir.

"*Q.* Now, at the time of the delivery, or the execution of this deed, or either of them, was there anything said in regard to recording the deeds by Lyman Luscombe?

"*A.* He stated he didn't want it recorded. The first

deed I inserted the words: 'This deed not to be recorded until after my death.'

"*Q.* Was there anything said about it at the time of the second deed ?

"*A.* He didn't want that recorded, said the same.

"*Q.* What was the language you inserted ?

"*A.* 'This deed is not to be recorded until after the death of Lyman Luscombe.' Lyman Luscombe came to me again in the winter of 1911. * * *

"*Q.* At the time of making the second deed was there anything said by Lyman in respect to his wanting to retain control of the deed or property during his lifetime ?

"*A.* No, sir."

I think it is quite clear from the foregoing testimony that Lyman W. Luscombe made and intended to make delivery of the deed in question, and that by such delivery a present estate passed to the grantees named in the instrument which could not afterwards be defeated through any change of mind on the part of the grantor. *Dyer* v. *Skadan*, 128 Mich. 348 (87 N. W. 277, 92 Am. St. Rep. 461); *Wilbur* v. *Grover*, 140 Mich. 187 (103 N. W. 583); *Blackford* v. *Olmstead*, 140 Mich. 583 (104 N. W. 47); *Wipfler* v. *Wipfler*, 153 Mich. 18 (116 N. W. 544, 16 L. R. A. [N. S.] 941), and cases there cited and reviewed.

The judgment should be affirmed.

MOORE, C. J., and STEERE and McALVAY, JJ., concurred with BROOKE, J.

OSTRANDER, J. (*dissenting*).  The subject of this controversy is 80 acres of land in the county of Montcalm in this State which was at one time owned by Lyman Luscombe; the parties complainant and the parties defendant each claiming title to the land through the said Lyman Luscombe. When the bill was filed, Lyman Luscombe was living and was made a party defendant. He has since died, but not until after his deposition had been taken, which appears in the record. The case involves some disputed facts, which the circuit judge determined

favorably to the complainants, and held that a deed made by the said Lyman Luscombe, conveying the premises to the defendants, should be delivered up to be canceled, that the defendants should convey to the complainants, and that a certain instrument made by the said Lyman Luscombe in his lifetime, conveying the said premises to the complainants, should be restored, "and that the said agreement between said Lyman Luscombe and John B. Luscombe be specifically performed."

The case made by the bill is that Lyman Luscombe, an unmarried man, residing at some distance from the land in question, proposed to his brother, the complainant John B. Luscombe, in March, 1878, that he remove his family and belongings to the land in question, saying that, if he would do so and would work and operate the farm, improve it, and pay the taxes, he might have the entire proceeds and profits of the land; that pursuant to this request the said John B. Luscombe consented to and did remove to the premises, occupied and tilled the land, and remained in possession until the spring of 1894. At that time the dwelling house had become dilapidated, and the complainant John B. Luscombe consulted with Lyman, suggesting that it was advisable to erect a new dwelling house upon the premises, receiving the reply that he should go on and erect a dwelling house and continue to live in it and upon the premises, that he, the said Lyman, had fixed the title to the premises in such a way that John B. Luscombe would have the same after his death, and that he would fix the title in such a way that said John B. should have the same after his death, without exactly stating the terms of the arrangement, whatever it was. Said John B. assented, erected a large and more commodious dwelling, paid the entire expense thereof, and built other buildings and structures, and during all the time down to the filing of the bill of complaint, which was in March, 1911, continued to occupy, crop, and improve the premises. Said John B. Luscombe received word, so he charges, in March, 1905, or

thereabouts, that a deed theretofore made by Lyman Luscombe, conveying the land to himself, was invalid and void because it had never been delivered. He informed Lyman Luscombe what he had heard, and thereafter, and on the next day, the complainant John B. and the said Lyman went to the city of Belding, and were informed that the former deed was invalid for the reason stated, when it was agreed between John B. and Lyman that a deed of the premises should be executed and delivered, conveying to John B. and his wife, Elizabeth, the said premises for the period of their natural lives with the remainder to complainant Robert Luscombe, a son of said John B. and Elizabeth; that such a deed was executed and then and there delivered to John B. Luscombe, who handed the same to the scrivener, "to be by him safely kept during the life of said defendant Lyman Luscombe, and then to be by him placed on record in the office of the register of deeds of said county of Montcalm." Later, and in February, 1911, complainant John B. was told by Peter Peterson, one of the defendants, to remove from the premises and surrender possession of the same to him, he claiming to be the owner thereof as grantee of Lyman Luscombe. Inquiry made by complainant John B. discovered the fact that the scrivener had delivered up the deed made in March, 1905, to the said Lyman Luscombe. An injunction is asked for, restraining Peter Peterson from entering upon the premises and disturbing complainants, restraining all defendants from concealing, disposing of, or destroying the deed of conveyance made in March, 1905, and a decree restoring said deed in case it had been lost or destroyed, and—

"That the said defendant be decreed specifically to perform said agreement so made by said Lyman Luscombe to and with your orator, John B. Luscombe, in the spring of A. D. 1895, as hereinbefore set forth, and to convey said premises to your orators and your oratrix in due form of law as agreed by and between said John B. Luscombe and said defendant Lyman Luscombe at the time last

above stated, your oratrix and orators being ready and willing and hereby offering to perform said contract fully and specifically on their part, and to do or perform any other act or thing that may seem to said court to be equitable in the premises."

Lyman Luscombe answered the bill, and denied the material allegations thereof, averring that John B. Luscombe came to him in March, 1878, or about that time, wanting to know what kind of an arrangement he could make to work the land in question, and that he told him that if he would work the farm in a good and proper manner, improve it, keep it fenced, pay the taxes, do the road work, he could have what he made thereon for his labor; that thereupon John B. moved upon the land, raised large and valuable crops, and made a good deal of money, enough to keep his family, and in addition, to purchase an adjoining farm; that he cut down and sold many hundred dollars' worth of valuable timber, taking the entire proceeds, had been able to travel extensively, but for several years had not kept up the fences, and had allowed the same to become dilapidated. Further answering, he says that John B. came to him "a few years ago" and requested permission to build the house now standing on the premises, that he gave him permission to build the house, but denies that it cost the amount stated in the bill, and says it did not cost to exceed $1,000, and in this connection avers that the receipts of the farm at a fair rental value prior to the time when the house was erected would exceed the value of all improvements placed thereon, before or after that time. Concerning the execution of the conveyance, he denies that he ever executed any at a time when complainant John B. was present, and avers that John B. was not informed by himself, and did not know of his intention to make any conveyance or conveyances of the land in question; that because he was becoming old, being 79 years and more of age, he desired to make a testamentary disposition of his property and considered the matter for a time, when he went to a justice of the

peace (the same one referred to in the bill of complaint), and consulted him with respect to making a will or disposition of his property to take effect only after his death; that the scrivener prepared a paper, but whether it was a will or contract or deed he does not know, except that he never understood that he was making a deed and never understood that the paper he executed was a deed, and had no knowledge at the time of filing his answer, except as he has since been advised, that the paper was a deed; says that, if it was a deed which conveyed any title whatever, it was contrary to the understanding and expectation and wish of himself; that whatever paper was made he left with the scrivener with the understanding that he could change the same or destroy it if he should choose to do so at any time thereafter; that whatever paper he executed provided that upon his death the premises should go to John B. Luscombe and at his death to his son Robert, but that he had always insisted upon retaining full control of the property during his lifetime, with the right to make other or different disposition of it. In this connection he avers that he was growing feeble, and considered that he might require the property for his own living and support.

He further avers that the scrivener did state to him later on that the paper which he had previously made was void, and told him of the decision of some court to that effect; that some time thereafter he met complainant John B. in Belding, and together they went to the place of business of the justice of the peace, who again informed him that it would be necessary to make other or different papers, and in a talk with said justice was told by him that he had fixed it up, but defendant did not know, and did not know at the time of filing his answer, whether he made a new paper or fixed over the old one. He avers that, whatever the justice of the peace did, he, Lyman, never understood he was making, and never intended to make, any paper which would be other than a testamentary disposition of his property and operate as a will. He says he

was requested by the said justice of the peace and by complainant Robert Luscombe to make a deed of the premises, which he refused to do.   He admits the occupancy of the premises by the complainant, but says that they are there as his tenants, subject to be removed at any time. He admits that he went to the justice of the peace and demanded of him the papers made by him, and says that the justice immediately acceded to his request, and advised him that he had a perfect right to destroy them, and, in fact, did advise him to destroy them, and he avers that he at once tore the papers up and destroyed them.   He, further answering, avers that he is old and infirm, unable to hear without the aid of an ear trumpet, with poor eyesight, no longer able to care for himself; that he has been living for some years with one Lester Carpenter, who married a niece, and had become indebted to the said Carpenter for medicine and board and care, and had to have money to discharge his obligation; and that in February, 1911, after destroying the papers originally made by him, he sold the property to the defendants Peter and Lulu Peterson, Lulu being his niece and wife of Peter, they paying him $1,000, which with his love and affection for his said niece was the consideration for the conveyance. The $1,000 he turned over to the Carpenters at whose home he was living at the time of drawing his answer, and who were providing for him.   Defendants Peter and Lulu in their answer assert that they are good-faith purchasers of the premises, for which they paid $1,000, and that they had no notice or knowledge of any rights on the part of John B. and Elizabeth Luscombe other than that they were tenants of Lyman Luscombe, subject to removal at any time when he, the said Lyman, desired.   They ask for affirmative relief.

An analysis of the testimony has led to conclusions which may be stated without setting out the testimony at large.   There was never any agreement between John B. and Lyman Luscombe by the terms of which Lyman agreed to convey the land, or any interest in it, to John

B. Nothing was ever done by John B. with respect to the land in reliance upon, or in consideration of, any promise or undertaking of Lyman to convey the land to him or to any one else. Entry was made and possession retained by John B. by permission of Lyman, and with the understanding that John B. should have the use of the land. But no term was agreed upon and no interest in the land created by any agreement of the parties. John B. Luscombe entered upon the land in 1878. In 1890 or 1892, according to his testimony, he inquired of Lyman what he would take for the place. He says that Lyman replied:

"I intend it to be yours any way. I am going to fix it that way so it will never have to be probated."

In this there is no indication that John B. claimed any interest in the land, or that Lyman intended any present gift to him. In 1894 the house erected by John B. upon the land was in such condition that he desired to build a new one. He consulted with Lyman, who said, according to the testimony of John B., "Go on and build it," and said he had fixed it or would fix it so the land "would be mine." John B. was asked by his counsel, "Would you have gone on and built the house unless he had given you that assurance?" and was answered, "I don't think I should." The house was built, but we find no evidence of an agreement to convey the land which the court could enforce. The house was built to accommodate John B. and his family. No obligation to build it was asserted or was implied. Looking again to the testimony of John B. Luscombe, we find that in 1898 Lyman told him that he had fixed the papers so it would be all right and would not have to be probated. "He had fixed the paper out for me, it wouldn't have to be probated." It was not until 1904 or 1905 that John B. was informed how Lyman had "fixed it." Even then he gained his information, not from Lyman, but from the officious justice of the peace and scrivener who had prepared the instrument.

John B. never saw the instrument, and knew and knows nothing of its terms, except from hearsay. Clearly there was no oral agreement to convey the land to him, and no gift was talked about except one to take effect after the death of Lyman.

As to the contents of the two instruments which were executed by Lyman, we have his testimony and that of the scrivener. The papers were destroyed. Lyman testified that he went to a justice of the peace, who had made out his pension vouchers, and told him what sort of instrument he desired drawn. This was in 1894. His instructions were to prepare an instrument which would give the place to John B. after he, Lyman, was done with it, for the life of John B. and his wife, remainder to Robert, son of John B. The scrivener testified that the old gentleman wanted the instrument drawn in such manner that it would convey a life estate to John B. and his wife, a life estate to Robert, son of John B., and remainder to Robert's eldest son. He testifies that he so prepared the instrument. He further testifies that Lyman wished to retain the property, so that, if necessary, he could use it for his own support; that he put nothing into the instrument to carry out this wish, but did write therein that it was not to be recorded until after the death of Lyman. The instrument was left with the scrivener. No one pretends that it was ever delivered to John B. The scrivener testifies that he did not believe it was a valid instrument, but, so long as it seemed to satisfy Lyman, he said nothing about it, understanding himself that he was bound to deliver it to Lyman upon his request. The scrivener had the custody of this instrument until late in 1904 or early in 1905. Meantime he continued to make out the quarterly pension vouchers for Lyman. Neither referred to the instrument. In 1904 or 1905 he informed Lyman that he thought the instrument was not valid. He took it upon himself also to inform John B. something about the instrument and the necessity for a new one.

It is somewhat difficult to gather from the testimony of the scrivener the reason for this counsel. Probably it was because he had read something from which he conceived that manual delivery of the instrument was necessary to give it validity, although he testifies that he thought the deed was invalid because creating a perpetuity.

Whatever the reason, Lyman and John B. appeared in the scrivener's store and office, and a new instrument was prepared which purported to create a life estate in the land for John B. and his wife, with remainder to Robert, son of John B. The instrument having been executed, the parties went through the form, according to Lyman, of having Lyman pass it to John B., who passed it back to Lyman, who delivered it to the scrivener, telling him to keep it or them "until I was done with them." The scrivener testified that Lyman passed the paper to John B., who handed it to the scrivener. There is much in the testimony of the scrivener tending to prove that Lyman intended, and that the scrivener knew he intended, to retain title to the property so long as he lived, and that he made these instruments, instead of making a will or wills, to avoid the expense and uncertainty of probating his estate. Clear it is that Lyman did not and could not dictate or formulate the method to be pursued or the language to be employed to accomplish his purpose, in which respects he relied upon the scrivener. It appears, too, that at the request of John B. and Robert the scrivener afterwards asked Lyman to make a deed, stating that Robert had consulted an attorney who told him that, in case Lyman died, the persons with whom he was living could present claims against his estate which would have to be paid out of this property if his personal estate was insufficient for that purpose. Lyman declined to make any other papers. Later, in 1911, the scrivener, at Lyman's request, made a deed of the property to defendants Peterson, and delivered to Lyman the two instruments formerly executed, and those instruments were destroyed.

The scrivener testified that he understood that Lyman had the right to demand, receive, and destroy those instruments at any time. The Petersons gave Lyman a valuable consideration for the land and deed.

Upon the whole record—direct reference has been made to but a small portion of the testimony—we feel compelled to disagree with the learned trial judge, and to find that complainants have not made out by a preponderance of evidence that Lyman Luscombe ever intended to part with his title to the land, or that in passing the deed to John B. he understood or believed that by so doing he was making effective a present transfer and conveyance of property. My Brother BROOKE has set out considerable of the testimony and reached the conclusion that Lyman Luscombe, when the last deed to complainants was made and the performance of a delivery gone through with, intended to make a delivery of the deed, and that by the delivery a present estate passed to the grantees. No opinion should be formed—I do not say that his has been so formed—from reading portions of the record. It must all of it be read. When it is read, it will be seen that the old gentleman had not changed his original purpose to keep and control the land so long as he lived. Otherwise, he would have executed and delivered his deed. What he did do was by direction of his scrivener, to whom he had once fully stated his purpose. Everything tends to prove that his original purpose had not changed. His original purpose was understood by the scrivener. But he had been advised by the scrivener that the deed first made was ineffectual to accomplish his purpose, which was to retain the title to and control over the land so long as he lived. He was seeking, by making the second conveyance, to make effectual a distinct purpose, namely, to retain control of his property and title thereto while he lived, and to secure a particular devolution of his estate after his death, without expense. To accomplish this, he did what the scrivener told him it was necessary to do. The understanding of the scrivener of the legal

effect of the instruments he prepared is not of importance, except as it explains the conduct, declarations, and intentions of Lyman Luscombe. It negatives the idea that Lyman Luscombe made a delivery of the deed for the purpose of immediately passing title. It clearly indicates, as does the later refusal of Lyman to execute another conveyance, that Lyman Luscombe did not intend to deliver the deed.

It is not a case in which, after delivery of a deed, the grantor, having changed his mind, seeks to defeat an estate he has created. Nor do the facts as stated herein bring the case within the rule of *Dawson* v. *Hall*, 2 Mich. 390; *Dyer* v. *Skadan*, 128 Mich. 348 (87 N. W. 277, 92 Am. St. Rep. 461); and *Wipfler* v. *Wipfler*, 153 Mich. 18 (116 N. W. 544, 16 L. R. A. [N. S.] 941). There are cases, and those just cited are such, where the act of making delivery of a deed by the grantor to the grantee is held to conclusively establish the fact of intentional, unconditional, delivery. And the rule of these cases ought to be applied whenever it appears that a grantor intended to deliver and a grantee intended to accept the instrument as a conveyance, without further act on the part of the grantor. But, as has been pointed out, in the case at bar, all of the parties witnessing the delivery understood that no such unequivocal acts of delivery and acceptance were taking place. Precisely the contrary. Suppose that one ignorant of the law was instructed by one supposed by him to have proper knowledge, that to carry out his clearly expressed and understood purpose he must do an act which, in law, if intentionally done, completely frustrated such purpose; would it be held that a court of equity could not give relief from the apparent effects of the fraud thus committed ? The case at bar is the case supposed, although the scrivener was innocent of any intention to defraud. Unmistakably, the testimony points to a desire and intention on the part of Lyman to retain title and to provide by some means other than a last testimonial for the devolution of the estate after his death. Unmistakably the act of delivering the deed was

done under the belief that it was necessary to the accomplishment of his purpose, and did not negative and frustrate that purpose, and all parties so understood it.

Holding this view, we determine that the decree of the court below should be reversed, and a decree entered in this court dismissing the bill of complaint, with costs of both courts to appellants. Appellants should have a decree for possession of the premises, and for an accounting as prayed for in the cross-bill.

STONE and BIRD, JJ., concurred with OSTRANDER, J.